# EXHIBIT A

eFiled
7/30/2025 12:58:33 PM
Superior Court
of the District of Columbia

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| HALBERT E. DOCKINS, JR. ) | |
| 5924 Holbrook Drive ) | |
| Jackson, MI 39206 ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | |
| ) | |
| AMAZON PRIME VIDEO, INC.; ) | CIVIL ACTION |
| 2021 7th Avenue S ) | 2025-CAB-005003 |
| Seattle, Washington 98134 ) | No.:_____ |
| ANDREW R. JASSY, President ) | |
| and CEO of Amazon Headquarters; ) | |
| 2021 7th Avenue S ) | JURY TRIAL DEMANDED |
| Seattle, Washington 98134 ) | |
| AMAZON MGM STUDIOS; ) | |
| 9336 Washington Blvd. ) | |
| Culver City, CA 90232 ) | |
| BOBBY SHRIVER; ) | |
| Unknown ) | |
| DOUBLE NICKEL ENTERTAINMENT; ) | |
| 234 W. 138 Street ) | |
| New York, NY 10030 ) | |
| FOXXHOLE PRODUCTIONS; ) | |
| 21731 Ventura Blvd., Ste. 300 ) | |
| Woodland Hills, CA 91364 ) | |
| and MAVEN SCREEN MEDIA ) | |
| 276 5th Avenue, #704-1442 ) | |
| New York, NY 10001 ) | |
| ) | |
| Defendants. ) | |

## **COMPLAINT**

1. Plaintiff Halbert E. Dockins Jr. ("Plaintiff" or "Mr. Dockins"), brings this action against

   Defendants, production companies, Amazon MGM Studios (formally Amazon Studios);

   distributor, Amazon Prime Video, Inc. (hereinafter "Amazon"), Andrew R. Jassy,

   President and CEO of Amazon.com; Bobby Shriver; Double Nickel Entertainment;

Foxxhole Productions; and Maven Screen Media (collectively the "Defendants") for the portrayal of Plaintiff by actor, Mamoudou Athie, in the 2023 Amazon film entitled *The Burial*, without compensation for use of the Plaintiff's name, image, and likeness.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this case pursuant to D.C. Code §§ 11-921 and 28-3905(k)(1)(D). Additionally, this Court has personal jurisdiction over the Defendants pursuant to D.C. Code § 13-423(a).

## PARTIES

3. Mr. Dockins is a resident of Jackson, Mississippi, an attorney and the Senior Partner at Dockins & Turnage, PLLC, 5924 Holbrook Dr., Jackson, MI 39206.

4. Mr. Dockins is the identity holder and publicity holder of the name, image, likeness, or identity used for the commercial gain of the Defendants.

5. Defendant Amazon MGM Studios, formerly Amazon Studios is a film streaming production and distribution company owned by Amazon, and a corporation organized under the laws of Delaware, with its principal place of business in Culver City, California. Productions from this company are primarily distributed through movie theatres under Metro-Goldwyn-Mayer (MGM) and Amazon's own streaming media service, Amazon Prime Video. On or about March of 2022, Amazon acquired the Hollywood studio MGM.

6. Amazon MGM Studios creates and produces original films and television series that premiere exclusively on Amazon Prime Video, which is available in over 200 countries and territories.

7. Defendant, Andrew R. Jassy, is the President and CEO of Amazon.com. Mr. Jassy serves on the Board of Directors. He founded and led Amazon Web Services (AWS) from its inception. Amazon Web Services (AWS) and Amazon Prime Video are both subsidiaries of Amazon.com, Inc.

8. Defendant Amazon Prime Video, Inc. (Prime Video), is a subscription video on-demand over-the-top streaming television service owned by Amazon. The main headquarters for Amazon Prime Video, Inc. is located at 2021 7th Ave S, Seattle, Washington 98134, and the company conducts business in the District of Columbia.

9. Defendant, Bobby Shriver, is a producer for *The Burial* movie. Mr. Shriver entered into a Life Story Rights Acquisition between Willie E. Gary and Jeremiah O'Keefe, which does not mention or include any rights from the Plaintiff.

10. Defendant, Double Nickel Entertainment, is listed as a producer of *The Burial* movie and is located at 234 W 138th St, New York, NY 10030.

11. Defendant, Foxxhole Productions is listed as a producer of *The Burial* movie and is located at 21731 Ventura Blvd Ste 300, Woodland Hills, CA, 91364.

12. Defendant, Maven Screen Media, is listed as a producer of *The Burial* movie and is based in London and New York City at 276 5th Avenue, #704-1442, New York, NY 10001.

13. At all times relevant herein, the Defendants portrayed the Plaintiff by actor Mamoudou Athie in the 2023 Amazon film entitled *The Burial*, without the Plaintiff's authorization license, or compensation for using the Plaintiff's name, image, likeness, or identity.

## NATURE OF THE ACTION

14. On October 13, 2023, *The Burial* movie was released by Defendants, Amazon MGM Studios and Amazon Prime Video, and streamed worldwide without compensation for the

3

use of the Plaintiff's name, image, and likeness. *The Burial* is inspired by true events involving Mr. Dockins, a Mississippi lawyer who helps a funeral homeowner Jeremiah O'Keefe (played by Tommy Lee Jones) by bringing the case to attorney Willie E. Gary (played by Jamie Foxx) to save his family business from a corporate behemoth. Mr. Dockins holds a common law right of publicity to his name, image, likeness, or identity as an individual including his brand as a practicing attorney. Plaintiff claims invasion of privacy, public disclosure of private facts, false light, unfair or deceptive trade practices, misappropriation, and right of publicity, against Amazon MGM Studios and Amazon Prime Video.

## FACTUAL BACKGROUND

15. On or about May 2, 1996, Defendant Bobby Shriver, entered into an agreement with Willie E. Gary and Jeremiah O'Keefe, a Life Story Rights Acquisition, which does not include an agreement with Plaintiff, or any rights from Plaintiff.

16. The Life Story Rights Acquisition agreement gave Defendant Bobby Shriver, inter alia, *"... all rights to exploit, distribute and exhibit any motion picture or other production based upon the Property in all media now known or hereafter devised throughout the universe, in perpetuity."* Exhibit A: Life Story Rights Acquisition agreement, Grant of Rights, p. 2, Section 4.

17. Mr. Dockins is a prominent Mississippi trial attorney, handling personal injury, business, and insurance matters, as a senior partner at Dockins & Turnage, PLLC.

18. Like Willie E. Gary and Jeremiah O'Keefe, Mr. Dockins's life story was portrayed in *The Burial*, and Defendants did not offer him any compensation.

19. Mr. Dockins is a private individual when it comes to his personal and professional life. Mr. Dockins has made a significant impact through his legal career with four decades dedicated to the legal profession, his reputation, and his brand.

20. Although Mr. Dockins always remained away from the limelight, he was brought to the limelight after *The Burial* (now streaming on Prime Video) was released by the Defendants, where he is one of the lawyers of Jeremiah O'Keefe, who sues Raymond "Ray" Loewen's Loewen Group in *Jeremiah J. O'Keefe, Sr., et al. v. Loewen Group, Inc. et al.*, No. 91–677–423. Photos of *The Burial's* advertising and promotion are below:











21. In reality, Mr. Dockins represented Jeremiah O'Keefe in at least two other matters prior to _Jeremiah J. O'Keefe, Sr., et al. v. Loewen Group, Inc. et al._, No. 91–677–423.

22. _The Burial_ consistently portrays Mr. Dockins as a young, inexperienced lawyer despite his having been a practicing attorney for eleven years when Jeremiah O'Keefe hired him.

23. Mr. Dockins, portrayed by Mamoudou Athie in _The Burial_, went to court in 1999 to settle attorney's fees for the O'Keefe case, which the trial court awarded in favor his client, Mike Allred.

24. The Mississippi Supreme Court reversed the initial ruling, stating that a 15% penalty should only apply to the disputed portion of the attorney's fee and not the entire fee.

25. Mr. Dockins continues to practice law in Jackson, Mississippi, specializing in business litigation and remains active on social media.

26. Mr. Dockins played a significant role in the real-life events stemming from this case that inspired a motion picture titled *The Burial*, produced by Bobby Shriver and Amazon MGM Studios; and was released and distributed by Amazon Prime Video in 2023.

27. *The Burial* film released by Amazon Prime Video in 2023 was a product of the aforementioned agreement.

28. Amazon Prime Video primarily distributes films and television series produced or co-produced by Amazon MGM Studios or licensed to Amazon, as Amazon Originals, with the service also hosting content from other providers, content add-ons, live sporting events, and video rental and purchasing services. Prime Video is offered both as a stand-alone service and as part of Amazon's Prime subscription.

29. Amazon Prime Video is the second most-subscribed video on demand streaming media service after Netflix, with 200 million paid memberships.

30. In 2020, Prime Video expanded its marketing campaigns and local productions to Latin America.

31. On May 26, 2021, it was officially announced that Amazon would acquire MGM for $8.45 billion, subject to regulatory approvals and other routine closing conditions.

32. Operating worldwide, the service may require a full Prime subscription to be accessed. In countries like United States, United Kingdom, and Germany, the service can be accessed without a full Prime subscription, whereas in Australia, Canada, France, India, Turkey, and Italy, it can only be accessed through a dedicated website.

33. Prime Video additionally offers a content add-on service in the form of channels, called Amazon Channels, or Prime Video Channels, which allow users to subscribe to additional video subscription services from other content providers within Prime Video.

34. Mr. Dockins did not give consent or grant any rights to Bobby Shriver, Amazon MGM Studios, or Amazon Prime Video to use his name, image, or likeness for commercial purposes in connection with *The Burial*.

35. Mr. Dockins has not received any compensation for the use of his name, image, or likeness, nor has he authorized the exploitation of his life events as portrayed in the film.

36. Defendants produced and distributed *The Burial*, which includes representations and references associated with Plaintiff's identity and personal experiences without his permission.

37. Defendants knowingly and willfully used the name, image, and likeness of Mr. Dockins without permission or authorization, which has resulted in harm to his reputation and personal life.

38. Defendants made public Mr. Dockins' name and likeness in connection with the film's marketing and distribution efforts, including but not limited to promotional materials and advertisements on Amazon Prime Video and Amazon.com.

39. The release and dissemination of *The Burial* have led to widespread recognition of Mr. Dockins' identity in a context he did not authorize or agree to.

40. As a result of Defendant's actions, Mr. Dockins' image and identity have been used for commercial gain without his knowledge or consent, causing him personal and professional hardship.

41. The unauthorized use of Mr. Dockins' identity has led to emotional distress, damage to his reputation, and confusion among the public regarding his association with the film.

42. The Defendants have received a benefit through revenue generated from subscriptions, advertising, licensing, and promotional activity.

43. Mr. Dockins has suffered from decreased opportunities in his professional life and emotional turmoil due to the misuse of his name and likeness by the Defendants.

44. Mr. Dockins' name, image, or likeness are used to depict the life story of Willie E. Gary and Jeremiah O'Keefe, in the film, *The Burial*, produced by Defendants Amazon MGM Studios, Amazon Prime Video, and Bobby Shriver, with no compensation to Mr. Dockins, for the use of his name, image, likeness, or identity.

45. Defendant's use of Mr. Dockins' name, image, likeness, or identity in *The Burial* has been continuous since the film's release.

46. To date, Defendants Amazon MGM Studios, Amazon Prime Video, and Bobby Shriver have not properly compensated Mr. Dockins for the use of his name, image, or likeness in *The Burial*.

47. Defendant Amazon Prime Video is a market leader and makes revenue from multiple monetization models.

48. In 2011, Defendant Amazon introduced Prime Video, providing access to 5,000 movies and TV shows as part of its Amazon Prime membership. It offers content that comes bundled with the basic subscription price, and special screenings that come at a rental cost. The video-on-demand service also runs a variety of ads to generate an additional source of revenue. Unlike Netflix, which relies mainly on subscriptions, Amazon Prime

Video bundles its service with Amazon Prime, making it harder to calculate revenue per viewership.

49. According to muvi.com, Amazon Prime Video subscriptions have earned 32.87 million dollars in revenue (Q3 2024) and are expected to surpass last year's 2023 annual revenue of $40.2 billion. In the early days, when Amazon Prime Video was focused on purely customer retention, it registered a revenue of $2.76 billion in 2014. From there to today, in the past 10 years, Amazon Prime Video has been able to make 20X more revenue, reaching 40 billion dollars.

50. According to Amazon Prime Video Terms of Use ("Terms"), Last Updated: October 19, 2023, by ordering or viewing *The Burial*, customers agree to Amazon's Terms.

51. Amazon Prime Video (the "Service") is a personalized service that offers, recommends and helps you discover digital movies, television shows and other video content (collectively, "Digital Content") and other services as provided in this Agreement; Service Terms, section 1. In general, the Service may allow you to: (i) access Digital Content on a subscription basis for viewing during a limited period of time during a subscription period (for example, through Amazon Prime or other subscription or standalone video subscription offering) ("Subscription Digital Content"), (ii) rent Digital Content for on-demand viewing over a limited period of time ("Rental Digital Content"), (iii) purchase Digital Content for on-demand viewing over an indefinite period of time ("Purchased Digital Content"), (iv) purchase Digital Content for pay-per-view viewing over a limited period of time ("PPV Digital Content"), and/or (v) access Digital Content on a free, ad-supported or promotional basis for viewing over a limited period of time ("Free Digital Content"). Digital Content may be available as Subscription Digital

Content, Rental Digital Content, Purchased Digital Content, PPV Digital Content, Free

Digital Content, or any combination of those, and in each case is subject to the limited

license grant. Service, Terms, section 4.

52. For example, all transactions for Purchased Digital Content, Rental Digital Content and

PPV Digital Content are final, and you may not cancel an order for Purchased Digital

Content or Rental Digital Content once you have started watching or downloading such

Digital Content. Purchase and Rental Transactions; Cancellations; Service Terms, section

4(e).

53. Subject to payment of any charges to rent, purchase, or access Digital Content, and your

compliance with all terms of this Agreement, Amazon grants you a non-exclusive,

nontransferable, non-sublicensable, limited license, during the applicable Viewing Period, to

access and view the Digital Content in accordance with the Usage Rules, for personal, non-

commercial, private use. We may automatically remove Digital Content from your

Compatible Device after the end of its Viewing Period. Limited License to Digital Content;

Service Terms, section 4(h).


## CAUSES OF ACTION

### COUNT I
### Invasion of privacy


54. Plaintiff incorporates by reference all preceding paragraphs 1-53 as if fully set forth

herein.

55. The District of Columbia has adopted the Restatement's approach that allows a claim

when a defendant receives a benefit, even if that benefit is not commercial.  *Vassiliades v.*

*Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc.*, 492 A.2d 580 (D.C. 1985); *Tripp v. United States*, 257 F. Supp. 2d 37 (D.D.C. 2003).

56. D.C. courts have adopted the common law appropriation invasion of privacy tort. *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1268 (D.C. 2015); (Restatement (Second) of Torts § 652A; Restatement (Second) of Torts § 652C. DC's common law appropriation invasion of privacy tort requires a plaintiff to show a recognizable value associated with their name or likeness, which may be based on: Public interest, commercial value, or some other value in the person's name or likeness. *Vassiliades v. Garfinckel's Brooks Bros.*, 492 A.2d 580, 592 (D.C. 1985).

57. Under District of Columbia common law, one who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy. *Butler v. Enterprise Integration Corporation*, 459 F.Supp.3d 78.

58. The interest protected by the proposition that one who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy under District of Columbia law, is in the nature of an individual property right in the exclusive use of one's own identity in so far as the use of one's name or likeness may be of benefit to him or others. *Id*.

59. The common form of invasion of privacy, under District of Columbia law, is the appropriation and use of the plaintiff's name or likeness to advertise the defendant's business or product, or for some similar commercial purpose. *Id*.

60. The law does not require a plaintiff (or identity holder) to be a celebrity or have a commercially valuable identity. However, some courts have required that the plaintiff's identity have some value. *Tripp v. United States*, 257 F. Supp. 2d 37 (D. D.C. 2003);

14

*Pearce v. E.F.; Hutton Group, Inc.*, 664 F. Supp. 1490, 1493-94 (D. D.C. 1987); *Peay v. Curtis Pub. Co.*, 78 F. Supp. 305 (D. D.C. 1948).

61. Defendants, Amazon MGM Studios (formerly Amazon Studios) and Amazon Prime Video are responsible for the production and distribution of *The Burial*.

62. Defendants Amazon MGM Studios and Amazon Prime Video publicly disclosed non-newsworthy, private details regarding Plaintiff's personal and professional background—specifically, aspects of his career, experience, and involvement in the events depicted in *The Burial*—without his consent and for the primary purpose of commercial exploitation.

63. Defendants selectively changed the names and likenesses of other key individuals portrayed in the film but preserved the Plaintiff's identity and narrative, signaling an intentional and selective use of his persona for dramatic effect and commercial gain.

64. For example, the Defendants changed the names and likenesses of Lorenzo Williams and Bob Parenti as actual defense team members and used the Plaintiff's name, image, likeness, or identity in *The Burial*.

65. *The Burial* consistently portrays the Plaintiff as a young, inexperienced lawyer despite his having been a practicing attorney for eleven years when Jeremiah O'Keefe hired him.

66. The Plaintiff represented Jeremiah O'Keefe in at least two other matters prior to *Jeremiah J. O'Keefe, Sr., et al. v. Loewen Group, Inc. et al.,* No. 91–677–423.

67. Defendants Amazon MGM Studios and Amazon Prime Video misappropriated the Plaintiff's name, image, likeness, and identity for use in the film *The Burial* without the Plaintiff's knowledge or consent.

68. Specifically, actor Mamoudou Athie portrays the Plaintiff as a young, skilled attorney who plays a pivotal role on Jeremiah's legal team, including facilitating the introduction between Jeremiah and attorney Willie Gary.

69. Mr. Athie's portrayal of the Plaintiff spans approximately 40 minutes of screen time and is used in the marketing, promotion, sale, and distribution of *The Burial* and related products on Amazon Prime Video and affiliated platforms.

70. The Plaintiff's personal involvement in events depicted in *The Burial* was disclosed and misrepresented without his permission, causing embarrassment and emotional distress.

71. Defendants publicly disclosed private facts about Plaintiff that were not of legitimate public concern.

72. The film's inaccurate representation of Plaintiff, combined with the unauthorized public disclosure of personal facts, caused embarrassment, emotional distress, and reputational harm.

73. Defendants derived a commercial benefit from the unauthorized portrayal of the Plaintiff—through revenue generated from subscriptions, advertising, licensing, and promotional activity.

74. Defendants used Mr. Dockins' name, image, likeness, or identity in advertising to increase website activity, streaming, sales, and membership subscriptions to their platforms.

75. *The Burial* has been advertised and commercially promoted by Amazon Prime Video since 2023 and portrays Mr. Dockins in a way that suggests endorsement or commercial gain.

76. Upon information and belief, Willie E. Gary and Jeremiah O'Keefe received an initial payment when they signed the Agreement with Defendant Bobby Shriver but they never received any compensation afterward nor have they been provided an accounting based on revenues from *The Burial*.

77. Because Defendants used Plaintiff's identity in a manner that was unauthorized, misleading, and solely for their own economic benefit, Plaintiff has established a valid claim for invasion of privacy through misappropriation of name or likeness**.**

78. Accordingly, Plaintiff respectfully requests that the Court grant relief consistent with the District of Columbia's common law protections.

## COUNT II
## Public disclosure of private facts

79. Plaintiff incorporates by reference all preceding paragraphs 1-78 as if fully set forth herein.

80. Under District of Columbia law, to state an invasion of privacy claim based on the disclosure of private facts, a plaintiff must establish the following: (1) publicity, (2) absent any waiver or privilege, (3) given to private facts (4) in which the public has no legitimate concern (5) and which would be highly offensive to a reasonable person of ordinary sensibilities; failure to establish any one of these elements will defeat a plaintiff's cause of action. *Budik v. Howard University Hospital*, 986 F.Supp.2d 1.

81. To recover for publication of private facts invasion of privacy, a plaintiff must show that a defendant: (1) published private facts; (2) in which the public has no legitimate concern; and (3) which publication would cause suffering, shame, or humiliation to a person of ordinary sensibilities. *Armstrong v. Thompson*, 80 A.3d 177. *Wolf v. Regardie*,

17

*553 A.2d 1213, 1220 (D.C. 1989)* (defining actionable public disclosure as dissemination of truthful, private information that is not of legitimate public concern).

82. Defendants are responsible for the production and distribution of *The Burial*.

83. Defendants publicly disclosed non-newsworthy, private, and potentially misleading facts concerning Plaintiff's personal and professional background through the film's narrative portrayal.

84. Defendants Amazon MGM Studios and Amazon Prime Video publicly disclosed non-newsworthy, private details regarding Plaintiff's personal and professional background— specifically, aspects of his career, experience, and involvement in the events depicted in *The Burial*—without his consent and for the primary purpose of commercial exploitation.

85. While *The Burial* altered the identities of other real-life participants such as Lorenzo Williams and Bob Parenti, the Defendants elected to use the Plaintiff's actual name, likeness, and persona, placing him in a central narrative role and casting him as a young, inexperienced attorney.

86. The Plaintiff has not waived his rights with respect to his background and the matters he was involved in as a practicing attorney.

87. Mr. Dockins had represented the plaintiff on at least two other matters prior to *Jeremiah J. O'Keefe, Sr., et al. v. Loewen Group, Inc. et al.,* No. 91–677–423.

88. *The Burial* consistently portrays the Plaintiff as a young, inexperienced lawyer despite his having been a practicing attorney for eleven years when Jeremiah O'Keefe hired the Plaintiff.

89. Defendants did not simply disclose information about who the Plaintiff is and what he does. Instead, the Defendants portrayed Plaintiff in a misleading manner that created a

false impression about his role in the events depicted and was highly offensive to the Plaintiff and others who watched *The Burial*.

90. These disclosures were not only misleading but lacked any legitimate public interest and were disseminated solely for Defendants' commercial gain.

91. Specifically, actor Mamoudou Athie portrays the Plaintiff as a young and capable attorney who is central to Jeremiah's legal team and plays a critical role in connecting Jeremiah with attorney Willie Gary.

92. Mr. Athie's depiction of the Plaintiff amounts to approximately 40 minutes of screen time (a significant portion of the film).

93. Defendants used Mr. Dockins' name, image, likeness, or identity in advertising to increase website activity, streaming, sales, and membership subscriptions to their platforms.

94. *The Burial* has been advertised and commercially promoted by Amazon Prime Video since 2023 and portrays Mr. Dockins in a way that suggests endorsement or commercial gain.

95. This portrayal is misleading, contrary to fact, and would be highly offensive to a reasonable person—particularly where Plaintiff had, in reality, practiced law for over a decade and had previously represented Jeremiah O'Keefe in multiple matters.

96. The film's depiction caused emotional distress and reputational harm, amplified by its broad commercial release and promotional use on Amazon's streaming platform.

97. Upon information and belief, Willie E. Gary and Jeremiah O'Keefe received an initial payment when they signed the Agreement but never received any money afterward nor have they been provided an accounting based on revenues from *The Burial*.

98. Accordingly, Plaintiff respectfully requests that the Court grant appropriate relief for the unauthorized and offensive public disclosure of private facts, consistent with D.C. law.

**COUNT III**
**False Light**

99. Plaintiff incorporates by reference all preceding paragraphs 1-98 as if fully set forth herein.

100. To prevail on a claim of invasion of privacy for false light, a plaintiff must show: (1) publicity (2) about a false statement, representation or imputation (3) understood to be of and concerning the plaintiff, and (4) which places the plaintiff in a false light that would be highly offensive to a reasonable person. *Lohrenz v. Donnelly*, 223 F.Supp.2d 25; *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990) (applying D.C. law; false light claim arises when portrayal is misleading and highly offensive to a reasonable person).

101. Defendants are not a news media entity as in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct 710, 11 L.Ed.2d 686 (1964), and are responsible for the production and distribution of *The Burial* film for commercial purposes. Therefore, the Plaintiff is not required to show actual malice.

102. Defendants portrayed Plaintiff in a false light by depicting him as an inexperienced attorney in *The Burial*, despite Plaintiff having practiced law for over a decade at the time depicted and having previously represented Jeremiah in multiple matters.

103. Mr. Dockins had represented the plaintiff on at least two other matters prior to *Jeremiah J. O'Keefe, Sr., et al. v. Loewen Group, Inc. et al.*, No. 91–677–423.

104. Moreover, the Defendants changed the names and likenesses of Lorenzo Williams and Bob Parenti as actual defense team members in _Jeremiah J. O'Keefe, Sr., et al. v. Loewen Group, Inc. et al._, No. 91–677–423, and used the Plaintiff's name, image, likeness, or identity in _The Burial_.

105. Defendants portrayed Plaintiff in a misleading manner that created a false impression about his role in the events depicted.

106. Specifically, actor Mamoudou Athie portrays the Plaintiff as a young and capable attorney who is central to Jeremiah's legal team and plays a critical role in connecting Jeremiah with attorney Willie Gary.

107. Mr. Athie's depiction of the Plaintiff amounts to approximately 40 minutes of screen time (a significant portion of the film).

108. The film misrepresented Plaintiff's contributions, diminished his actual role, and casted him in an inaccurate light which was highly offense to the Plaintiff and other viewers of the film.

109. _The Burial_ has been advertised and commercially promoted by Amazon Prime Video since 2023 and portrays Mr. Dockins in a way that suggests endorsement or commercial gain.

110. The representations made about the Plaintiff in _The Burial_ are misleading and created an erroneous perception about the Plaintiff among the public.

111. Defendants Amazon MGM Studios and Amazon Prime Video falsely portrayed Plaintiff—a seasoned attorney with over a decade of legal experience and a history of representing Jeremiah O'Keefe—as an inexperienced, newly minted lawyer whose

involvement in the events underlying *The Burial* was both overstated and mischaracterized.

112. This portrayal, disseminated through a commercially released and widely promoted film, misleads the viewing public by diminishing Plaintiff's actual role, experience, and professional stature, thereby satisfying the elements of a false light claim.

113. Moreover, the Defendants' selective alteration of the names and likenesses of other team members while preserving Plaintiff's identity further supports the conclusion that Plaintiff was deliberately singled out for misrepresentation.

114. Such a portrayal, amplified across commercial streaming platforms for profit and under the guise of factual storytelling, is not only misleading but highly offensive to a reasonable person in Plaintiff's position.

115. The harm to Plaintiff's reputation and legacy as a legal professional is both real and actionable.

116. Accordingly, Plaintiff respectfully requests that the Court grant appropriate relief for the injury caused by Defendants' false light publication under District of Columbia law.


## COUNT IV
## Unfair or Deceptive Trade Practices, D.C Code § 28-3904(a), (d), (e)

117. Plaintiff incorporates by reference all preceding paragraphs 1-116 as if fully set forth herein.

118. The D.C. Consumer Protection Procedures Act (CPPA) prohibits any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged. D.C. Code § 28-3904. *Whiting v. AARP, 701 F. Supp. 2d 21, 28*

*(D.D.C. 2010)* (interpreting CPPA broadly to include misleading representations likely to mislead consumers).

119. Defendants, Amazon MGM Studios (formerly Amazon Studios) and Amazon Prime Video are responsible for the production and distribution of *The Burial*.

120. Defendants went on with the release of *The Burial* as if they had permission to use Plaintiff's identity in promotional materials for *The Burial*.

121. Defendants engaged in deceptive practices by misrepresenting their authorization to use Plaintiff's name, image, likeness, or identity.

122. Defendants knowingly and unlawfully used Plaintiff's name, image, likeness, and identity—without Plaintiff's written or oral consent—in connection with the commercial, promotional, advertising, sales, and membership subscriptions related to *The Burial*.

123. Specifically, actor Mamoudou Athie portrays the Plaintiff as a young and capable attorney who is central to Jeremiah's legal team and plays a critical role in connecting Jeremiah with attorney Willie Gary.

124. The Defendants changed the names and likenesses of Lorenzo Williams and Bob Parenti as actual defense team members and used the Plaintiff's name, image, likeness, or identity in *The Burial* without his approval or sponsorship.

125. Mr. Dockins had represented the plaintiff on at least two other matters prior to *Jeremiah J. O'Keefe, Sr., et al. v. Loewen Group, Inc. et al.*, No. 91–677–423.

126. *The Burial* has been advertised and commercially promoted by Amazon Prime Video since 2023 and portrays Mr. Dockins in a way that suggests the Plaintiff's endorsement or commercial gain which is likely to mislead viewers.

127. Defendants used the Plaintiff's name, image, likeness, or identity in advertising to increase website activity, streaming, sales, and membership subscriptions to their platforms.

128. Defendants used the Plaintiff's name, image, likeness, or identity in a manner resulting in disparagement of the services or law practice of the Plaintiff by false or misleading representations of material facts about the Plaintiff in *The Burial*.

129. Defendants misrepresented the Plaintiff's background while using his name, image, likeness, or identity in *The Burial* to enhance commercial appeal.

130. Courts have generally recognized that streaming platforms operating under a subscription and advertisement-based model fall within the scope of commercial enterprises, particularly when monetizing user engagement through paid memberships, pay-per-view rentals, and advertising revenue. Courts have found that when a company monetizes creative works in this way, it is operating with a commercial purpose rather than purely for expressive or informational purposes. Amazon Prime Video's streaming business has a commercial purpose as evidenced by the nature of various previous claims.

131. For example, in *Napoleon v. Amazon.com Inc*., a collection of four class actions against Amazon challenged Prime Video's advertisement-based revenue model, reinforcing the commercial nature of its streaming business. Plaintiffs in all four actions generally allege that Defendant breached its duties to its Amazon Prime subscribers when, on January 29, 2024, it imposed an additional monthly fee of $2.99 for commercial-free video streaming, a service that    Plaintiffs claim customers had already paid for through their annual subscription fee. *Id*.[1]

---

[1] Case Nos. 2:24-cv-186-BJR, 2:24-cv-309-BJR, 2:24-cv-364-BJR, and 2:24-cv-728-BJR.

132. In _District of Columbia v. Amazon.com, Inc_., 320 A.3d 1073, 2024 WL 3893698 (August

22, 2024), District of Columbia brought action against online retail marketplace operator

alleging restraint of trade and monopoly violations of the Antitrust Act. The District of

Columbia Court of Appeals held that: 1) District adequately alleged that operator exerted

substantial market power in online retail market; 2) District plausibly alleged operator's

agreements with sellers imposed an unreasonable restraint on trade; and 3) District's

allegations were sufficient to state a claim for an illegal monopoly. _Id_.

133. In _Fed. Trade Comm'n v. Amazon.com_, 2:23-cv-00932-JHC (W.D. Wash. 2023), The

Federal Trade Commission (FTC) sued Amazon in the U.S. District Court for the Western

District of Washington, alleging that Amazon used "dark patterns" to mislead consumers into

enrolling in Amazon Prime and made cancellation deliberately difficult. The case claims

violations of the Restore Online Shoppers' Confidence Act (ROSCA) and the FTC Act. _Id_.

134. In _FTC v. Amazon.com, Inc_., Case No. 2:23-cv-01495-JCC (W.D. Wash. 2023), the FTC

and 17 state attorneys general filed an antitrust lawsuit against Amazon, alleging the

company engaged in anti-competitive conduct to maintain its monopoly power in the online

marketplace. This lawsuit is one of the most significant legal challenges Amazon has faced in

recent years. _Id_.

135. In _In re Amazon Prime Video Litigation_, No. 2:2022cv00401 (W.D. Wash. 2024),

consolidated multiple consumer lawsuits regarding Amazon's digital content ownership

policies. Plaintiffs alleged that Amazon misled consumers into believing that purchased

movies and TV shows were permanently owned when, in fact, Amazon retains the right to

remove access under its terms of service. Amazon agreed to pay $25 million to settle

allegations that it violated the Children's Online Privacy Protection Act (COPPA) by improperly retaining children's voice recordings and failing to honor deletion requests for Alexa users. *Id*.

136. In *Amazon.com, Inc. v. Prime Video Subscribers*, No. 2:24-cv-00186 (W.D. Wash. 2024), Amazon was sued for introducing ads into Prime Video and requiring consumers to pay an additional $2.99 per month to remove them. The plaintiffs argued that this constituted deceptive conduct, as Prime Video was previously marketed as an ad-free service. *Id*.

137. Amazon is noted as a leading SVoD platform for Q2 2023, with a worldwide footprint and 200 million monthly subscribers.[2]

138. Moreover, Amazon Prime Video's 2023 content budget was estimated at US$10 billion.[3]

139. Defendants, for commercial, promotional, and advertising purposes, knowingly and unlawfully used Plaintiff's name, image, likeness, and identity—without Plaintiff's written or oral consent—in connection with the film *The Burial*.

140. Specifically, actor Mamoudou Athie portrays the Plaintiff as a young and capable attorney who is central to Jeremiah's legal team and plays a critical role in connecting Jeremiah with attorney Willie Gary.

141. Mr. Athie's depiction of the Plaintiff amounts to approximately 40 minutes of screen time (a significant portion of the film). This portrayal was used by Defendants in the marketing, distribution, and sale of *The Burial* and related products available through Amazon Prime Video and affiliated platforms.

142. WHEREFORE, Plaintiff respectfully requests judgment against Defendants for all remedies

---

[2] Prof. Jean K. Chalaby, Department of Sociology; City, University of London, Television and the digital economy: An assessment of the impact of streaming platforms on the TV industry, pp. 6 (Table 2) and 20 (Table 4).
[3] Ibid., p. 22.

available under D.C. Code § 28-3904, including but not limited to, both actual loss and

damages, costs, interest, royalties, and restitution of Defendant's unlawful proceeds,

including Defendant's profits and other relief deemed just and fair.

### COUNT V
### Misappropriation of Name, Image, and Likeness against
### AMAZON MGM STUDIOS, AMAZON PRIME VIDEO, Inc., DOUBLE NICKEL
### ENTERTAINMENT, FOXXHOLE PRODUCTIONS, and MAVEN SCREEN MEDIA

143. Plaintiff incorporates by reference all preceding paragraphs 1-142 as if fully set forth herein.

144. District of Columbia (D.C.) recognizes the common law right of publicity. *Tripp v. U.S.,*

*257 F. Supp. 2d 37, 42 (D.D.C. 2003)* (recognizing common law misappropriation claim for

unauthorized use of likeness). *Vassiliades v. Garfinckel's, Brooks Bros., 492 A.2d 580, 586*

*(D.C. 1985)* (recognizing unauthorized commercial use of identity as actionable under right

of publicity). The misappropriation tort is "indistinguishable as a legal matter" from the

"right of publicity." *Lane v. Random House, Inc.*, 985 F. Supp. 141 (D. D.C. 1995).

145. Under D.C. common law, appropriation occurs when a defendant uses a plaintiff's likeness

or identity for their benefit without consent. Specifically, the defendant must have

appropriated to their own use or benefit the reputation, prestige, social or commercial

standing, public interest, or other values of the Plaintiff's name or likeness. *Doe v. Bernabei*

*& Wachtel, PLLC*, 116 A.3d 1262.

146. D.C. has adopted the four forms of privacy invasion set forth in Restatement (Second) of

Torts § 652A. One who appropriates to his own use or benefit the name or likeness of

another is subject to liability to the other for invasion of his privacy. Restatement (Second) of

Torts § 652C.

147. The defense of public interest or newsworthiness does not apply if the use is primarily for

commercial exploitation rather than public discourse. _Vassiliades v. Garfinckel's, Brooks_

_Bros., 492 A.2d 580._

148. Defendants misappropriated Plaintiff's name, image, likeness, identity and persona for

commercial exploitation without authorization, in violation of District of Columbia common

law protections.

149.  Defendants, Amazon MGM Studios (formerly Amazon Studios) and Amazon Prime Video

are responsible for the production and distribution of _The Burial_.

150. Given their subscription model, ad revenue, pay-per-view structure, and licensing deals,

Defendants Amazon MGM Studios and Amazon Prime Video operate as a commercial entity

under federal and state law.

151. Defendant Amazon Prime Video is a market leader and makes revenue from multiple

monetization models.

152. According to Amazon Prime Video Terms of Use (Terms), Last Updated: October 19, 2023,

by ordering or viewing _The Burial_, customers agree to Amazon's Terms.

153. Defendant Amazon introduced Prime Video, which provides access to 5,000 movies and

TV shows as part of its Amazon Prime membership. It offers content that comes bundled

with the basic subscription price, special screenings that come at a rental cost. The video-on-

demand service also runs a variety of ads to generate an additional source of revenue. Unlike

Netflix, which relies mainly on subscriptions, Amazon Prime Video bundles its service with

Amazon Prime, making it harder to calculate revenue per viewership.

154. According to muvi.com, Prime Video subscriptions have earned 32.87 million dollars in

revenue (Q3 2024) and are expected to surpass last year's 2023 annual revenue of $40.2

billion. In the early days, when Amazon Prime Video was focused on purely customer

retention, it registered a revenue of $2.76 billion in 2014. From there to today, in the past 10

years, Amazon Prime Video has been able to make 20X more revenue, reaching 40 billion

dollars.

155. Courts have generally recognized that streaming platforms operating under a subscription

and advertisement-based model fall within the scope of commercial enterprises, particularly

when monetizing user engagement through paid memberships, pay-per-view rentals, and

advertising revenue. Courts have found that when a company monetizes creative works in

this way, it is operating with a commercial purpose rather than purely for expressive or

informational purposes. Amazon Prime Video's streaming business has a commercial

purpose as evidenced by the nature of various previous claims.

156. For example, in _Napoleon v. Amazon.com Inc_., a collection of four class actions against

Amazon challenged Prime Video's advertisement-based revenue model, reinforcing the

commercial nature of its streaming business. Plaintiffs in all four actions generally allege that

Defendant breached its duties to its Amazon Prime subscribers when, on January 29, 2024, it

imposed an additional monthly fee of $2.99 for commercial-free video streaming, a service

that Plaintiffs claim customers had already paid for through their annual subscription fee. _Id_.[4]

157. In _District of Columbia v. Amazon.com, Inc_., 320 A.3d 1073, 2024 WL 3893698 (August

22, 2024), District of Columbia brought action against online retail marketplace operator

alleging restraint of trade and monopoly violations of the Antitrust Act. The District of

Columbia Court of Appeals held that: 1) District adequately alleged that operator exerted

substantial market power in online retail market; 2) District plausibly alleged operator's

---

[4] Case Nos. 2:24-cv-186-BJR, 2:24-cv-309-BJR, 2:24-cv-364-BJR, and 2:24-cv-728-BJR.

agreements with sellers imposed an unreasonable restraint on trade; and 3) District's

allegations were sufficient to state a claim for an illegal monopoly. *Id*.

158. In *Fed. Trade Comm'n v. Amazon.com*, 2:23-cv-00932-JHC (W.D. Wash. 2023), The

Federal Trade Commission (FTC) sued Amazon in the U.S. District Court for the Western

District of Washington, alleging that Amazon used "dark patterns" to mislead consumers into

enrolling in Amazon Prime and made cancellation deliberately difficult. The case claims

violations of the Restore Online Shoppers' Confidence Act (ROSCA) and the FTC Act. *Id*.

159. In *FTC v. Amazon.com, Inc.*, Case No. 2:23-cv-01495-JCC (W.D. Wash. 2023), the FTC

and 17 state attorneys general filed an antitrust lawsuit against Amazon, alleging the

company engaged in anti-competitive conduct to maintain its monopoly power in the online

marketplace. This lawsuit is one of the most significant legal challenges Amazon has faced in

recent years. *Id*.

160. In *In re Amazon Prime Video Litigation*, No. 2:2022cv00401 (W.D. Wash. 2024),

consolidated multiple consumer lawsuits regarding Amazon's digital content ownership

policies. Plaintiffs alleged that Amazon misled consumers into believing that purchased

movies and TV shows were permanently owned when, in fact, Amazon retains the right to

remove access under its terms of service. Amazon agreed to pay $25 million to settle

allegations that it violated the Children's Online Privacy Protection Act (COPPA) by

improperly retaining children's voice recordings and failing to honor deletion requests for

Alexa users. *Id*.

161. In *Amazon.com, Inc. v. Prime Video Subscribers*, No. 2:24-cv-00186 (W.D. Wash. 2024),

Amazon was sued for introducing ads into Prime Video and requiring consumers to pay an

additional $2.99 per month to remove them. The plaintiffs argued that this constituted

deceptive conduct, as Prime Video was previously marketed as an ad-free service. *Id*.

162. Amazon is noted as a leading SVoD platform for Q2 2023, with a worldwide footprint and 200 million monthly subscribers.[5]

163. Moreover, Amazon Prime Video's 2023 content budget was estimated at US$10 billion.[6]

164. The Plaintiff had represented Jeremiah O'Keefe on at least two other matters prior to *Jeremiah J. O'Keefe, Sr., et al. v. Loewen Group, Inc. et al.,* No. 91–677–423.

165. By singling out the Plaintiff's name, image, likeness, or identity, as an attorney who played a significant role in *Jeremiah J. O'Keefe, Sr., et al. v. Loewen Group, Inc. et al.*, the Defendants appropriated the Plaintiff's name, image, likeness, or identity, and took financial advantage of the value associated with the Plaintiff's name as a key figure in Jeremiah *J. O'Keefe, Sr., et al. v. Loewen Group, Inc. et al*. to produce *The Burial*.

166. Defendants knowingly and unlawfully used Plaintiff's name, image, likeness, and identity—without Plaintiff's license, or written or oral consent—in connection with the commercial, promotional, advertising, sales, and membership subscriptions related to *The Burial*.

167. Specifically, actor Mamoudou Athie portrays the Plaintiff as a young and capable attorney who is central to Jeremiah's legal team and plays a critical role in connecting Jeremiah with attorney Willie Gary.

168. Mr. Athie's depiction of the Plaintiff amounts to approximately 40 minutes of screen time (a significant portion of the film).

169. The Defendants changed the names and likenesses of Lorenzo Williams and Bob Parenti as

---

[5] Prof. Jean K. Chalaby, Department of Sociology; City, University of London, Television and the digital economy: An assessment of the impact of streaming platforms on the TV industry, pp. 6 (Table 2) and 20 (Table 4).
[6] Ibid., p. 22.

actual defense team members and used the Plaintiff's name, image, likeness, or identity in *The Burial*.

170. The plaintiff's name and likeness were used in connection with *The Burial* distributed by Amazon MGM Studios and Amazon Prime Video without authorization, license, or compensation.

171. Defendants appropriated Plaintiff's name, image, likeness, or identity without consent or license for commercial purposes in the production and distribution of *The Burial*.

172. Defendants appropriated Plaintiff's brand and image as an attorney without consent or license for commercial purposes in the sale and distribution of *The Burial*.

173. Defendants never sought permission nor authorization to use Plaintiff's name, image, likeness, or identity to advertise, promote, market, or endorse *The Burial*.

174. Plaintiff never consented to, permitted, assigned, licensed, or otherwise agreed to Defendant's use of his name, image, likeness, or identity to advertise, promote, market, or endorse *The Burial*.

175. In October of 2023, the Defendants went forward with the release of *The Burial*, using the unique name, image, likeness, or identity of the Plaintiff without his permission.

176. Defendants intentionally or, at a minimum, recklessly published, printed, displayed, or otherwise publicly disseminated or used Plaintiff's name, image, likeness, or identity without his express written or oral consent, or license, for purposes of trade or other commercial or advertising purposes as detailed above.

177. Defendants had actual or constructive knowledge of the wrongfulness of its conduct and acted with intent or with reckless disregard to deprive Plaintiff of a property interest during the entire period in which the unauthorized use took place.

178. Defendants used Mr. Dockins' name, image, likeness, or identity, without license, in advertising to increase website activity, streaming, sales, and membership subscriptions on their platforms.

179. *The Burial* has been advertised and commercially promoted by Amazon Prime Video since 2023 portrays Mr. Dockins in a way that suggests endorsement or commercial gain.

180. Upon information and belief, Willie E. Gary and Jeremiah O'Keefe received an initial payment when they signed the Agreement but never received any money afterward nor have they been provided an accounting based on revenues from *The Burial*.

181. The Defendants changed the names and likenesses of Lorenzo Williams and Bob Parenti as actual defense team members in *The Burial*.

182. At a minimum, Defendant's conduct was so reckless or wanton in care that it constituted a conscious disregard of or indifference to Plaintiff's rights.

183. Alternatively, Defendants acted negligently towards Plaintiff, in using and disseminating, without authority, his name, image, likeness, or identity on Defendant's websites to promote, advertise, and market *The Burial*.

184. Defendants have caused and will continue to cause irreparable harm to Plaintiff and his reputation and brand by attributing Plaintiff to *The Burial*.

185. Defendant has also damaged Plaintiff, as a direct and proximate result of its unauthorized use of Plaintiff's name, image, likeness, or identity without compensating Plaintiff.

186. A plaintiff need not be a celebrity or public figure to assert this claim, so long as their identity possesses commercial, reputational, or public value that is wrongfully appropriated for another's benefit. *Tripp v. United States*, 257 F. Supp. 2d 37, 42 (D.D.C. 2003); *Restatement (Second) of Torts § 652C.*

187. Defendants Amazon MGM Studios and Amazon Prime Video knowingly and unlawfully appropriated Plaintiff's name, image, likeness, and identity for use in the film *The Burial*, which was marketed, distributed, and monetized across their platforms.

188. This unauthorized use was not incidental; it formed a substantial portion of the film— approximately 40 minutes of screen time—and was integrated into advertising campaigns, subscriber offerings, and digital promotions to drive streaming revenue and viewer engagement.

189. Given that Defendants operate a commercial streaming service generating billions in revenue through a hybrid model of subscriptions, advertising, licensing, and digital distribution, their exploitation of Plaintiff's likeness was done with a clear and direct commercial purpose.

190. The defense of newsworthiness or public interest cannot shield such conduct, particularly where the use of Plaintiff's identity served primarily to promote and monetize an entertainment product.

191. Accordingly, Plaintiff respectfully requests that the Court grant all available relief for Defendants' misappropriation of his name, image, likeness, and identity in violation of District of Columbia common law.

### COUNT VI
### Misappropriation of Name, Image, and Likeness against
### BOBBY SHRIVER

192. Plaintiff incorporates by reference all preceding paragraphs 1-191 as if fully set forth herein.

193. District of Columbia (D.C.) recognizes the common law right of publicity. *Tripp v. U.S., 257 F. Supp. 2d 37, 42 (D.D.C. 2003)* (recognizing common law misappropriation claim for unauthorized use of likeness). *Vassiliades v. Garfinckel's, Brooks Bros., 492 A.2d 580, 586*

*(D.C. 1985)* (recognizing unauthorized commercial use of identity as actionable under right of publicity). The misappropriation tort is "indistinguishable as a legal matter" from the "right of publicity." <u>Lane v. Random House, Inc</u>., 985 F. Supp. 141 (D. D.C. 1995).

194. Under D.C. common law, appropriation occurs when a defendant uses a plaintiff's likeness or identity for their benefit without consent. Specifically, the Defendant must have appropriated to their own use or benefit the reputation, prestige, social or commercial standing, public interest, or other values of the Plaintiff's name or likeness. <u>Doe v. Bernabei & Wachtel, PLLC</u>, 116 A.3d 1262.

195. D.C. has adopted the four forms of invasion of privacy set forth in Restatement (Second) of Torts § 652A. One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy. Restatement (Second) of Torts § 652C.

196. The defense of public interest or newsworthiness does not apply if the use is primarily for commercial exploitation rather than public discourse. <u>*Vassiliades v. Garfinckel's, Brooks Bros., 492 A.2d 580.*</u>

197. Despite the clear language of the aforementioned laws, Defendant published Plaintiff's, name, image, likeness, or identity on its websites to promote, advertise, and market *The Burial* and other products, subscriptions, and services on the Defendants' websites.

198. Given their subscription model, ad revenue, pay-per-view structure, and licensing deals, Defendants Amazon MGM Studios and Amazon Prime Video operate as a commercial entity under federal and state law.

199. Defendant Bobby Shriver became the producer of *The Burial*, after he executed a Life Story Rights Acquisition deal with Jeremiah O'Keefe and Willie E. Gary on May 22, 1996.

However, the agreement did not include the Plaintiff who played a significant role in the matter portrayed in *The Burial*. *See* Life Story Rights Acquisition Agreement.

200. The production companies listed in connection with *The Burial* include Amazon Studios, Bobby Shriver, Double Nickel Entertainment, Foxxhole Productions, Maven Screen Media, (Celine Rattray, p.g.a., Trudie Styler, p.g.a., Jamie Foxx, p.g.a., Datari Turner, p.g.a., Jenette Kahn, p.g.a., Adam Richman, p.g.a., Bobby Shriver, p.g.a.). The distribution companies include MetFilm Distribution (UK 2023) and Amazon Prime Video (worldwide 2023).

201. The Defendants changed the names and likenesses of Lorenzo Williams and Bob Parenti as actual defense team members and used the Plaintiff's name, image, likeness, or identity in *The Burial*.

202. The Plaintiff had represented Jeremiah O'Keefe on at least two other matters prior to *Jeremiah J. O'Keefe, Sr., et al. v. Loewen Group, Inc. et al.,* No. 91–677–423.

203. The plaintiff's name and likeness were used in connection with *The Burial* produced by Defendant Bobby Shriver without authorization, license, or compensation.

204. Defendant appropriated Plaintiff's name, image, and likeness without consent or license, for commercial purposes in the production and distribution of *The Burial*.

205. Defendants never sought permission nor authorization to use Plaintiff's name, image, likeness, or identity to advertise, promote, market, or endorse *The Burial*.

206. Plaintiff never consented to, permitted, assigned, licensed, or otherwise agreed to Defendant's use of his name, image, likeness, or identity to advertise, promote, market, or endorse *The Burial*.

207. In October of 2023, the Defendants went forward with the release of *The Burial*, using the unique name, image, likeness, or identity of the Plaintiff without a license or his permission.

208. Defendants intentionally or, at a minimum, recklessly published, printed, displayed, or otherwise publicly disseminated or used Plaintiff's name, image, likeness, or identity without his express written or oral consent, for purposes of trade or other commercial or advertising purposes as detailed above.

209. Defendants had actual or constructive knowledge of the wrongfulness of its conduct and acted with intent or with reckless disregard to deprive Plaintiff of a property interest during the entire period in which the unauthorized use took place.

210. Defendants knowingly and unlawfully used Plaintiff's name, image, likeness, and identity—without Plaintiff's written or oral consent—in connection with the commercial, promotional, advertising, sales, and membership subscriptions related to *The Burial*.

211. Specifically, actor Mamoudou Athie portrays the Plaintiff as a young and capable attorney who is central to Jeremiah's legal team and plays a critical role in connecting Jeremiah with attorney Willie Gary.

212. Mr. Athie's depiction of the Plaintiff amounts to approximately 40 minutes of screen time (a significant portion of the film).

213. *The Burial* has been advertised and commercially promoted by Amazon Prime Video since 2023 portrays Mr. Dockins in a way that suggests endorsement or commercial gain.

214. Upon information and belief, Willie E. Gary and Jeremiah O'Keefe received an initial payment when they signed the Agreement but never received any money afterward nor have they been provided an accounting based on revenues from *The Burial*.

215. At a minimum, Defendant's conduct was so reckless or wanton in care that it constituted a conscious disregard of or indifference to Plaintiff's rights.

216. Alternatively, Defendants acted negligently towards Plaintiff, in using and disseminating,

without authority, his name, image, likeness, or identity on Defendant's websites to promote, advertise, and market *The Burial*.

217. Defendants have caused and will continue to cause irreparable harm to Plaintiff and his reputation and brand by attributing Plaintiff to *The Burial*.

218. Defendant has also damaged Plaintiff, as a direct and proximate result of its unauthorized use of Plaintiff's name, image, likeness, or identity without compensating Plaintiff.

219. A plaintiff need not be a celebrity or public figure to assert this claim, so long as their identity possesses commercial, reputational, or public value that is wrongfully appropriated for another's benefit. *Tripp v. United States*, 257 F. Supp. 2d 37, 42 (D.D.C. 2003); *Restatement (Second) of Torts § 652C.*

220. Defendants Amazon MGM Studios and Amazon Prime Video knowingly and unlawfully appropriated Plaintiff's name, image, likeness, and identity for use in the film *The Burial*, which was marketed, distributed, and monetized across their platforms.

221. This unauthorized use was not incidental; it formed a substantial portion of the film— approximately 40 minutes of screen time—and was integrated into advertising campaigns, subscriber offerings, and digital promotions to drive streaming revenue and viewer engagement.

222. Given that Defendants operate a commercial streaming service generating billions in revenue through a hybrid model of subscriptions, advertising, licensing, and digital distribution, their exploitation of Plaintiff's likeness was done with a clear and direct commercial purpose.

223. The defense of newsworthiness or public interest cannot shield such conduct, particularly where the use of Plaintiff's identity served primarily to promote and monetize an

entertainment product.

224. Accordingly, Plaintiff respectfully requests that the Court grant all available relief for

Defendants' misappropriation of his name, image, likeness, and identity in violation of

District of Columbia common law.

### COUNT VII
### Misappropriation of Name, Image, and Likeness against
### ANDREW R. JASSY, President and CEO of Amazon Headquarters

225. Plaintiff incorporates by reference all preceding paragraphs 1-224 as if fully set forth herein.

226. District of Columbia (D.C.) recognizes the common law right of publicity. *Tripp v. U.S.,*

*257 F. Supp. 2d 37, 42 (D.D.C. 2003)* (recognizing common law misappropriation claim for

unauthorized use of likeness). *Vassiliades v. Garfinckel's, Brooks Bros., 492 A.2d 580, 586*

*(D.C. 1985)* (recognizing unauthorized commercial use of identity as actionable under right

of publicity). The misappropriation tort is "indistinguishable as a legal matter" from the

"right of publicity." *Lane v. Random House, Inc.*, 985 F. Supp. 141 (D. D.C. 1995).

227. Under D.C. common law, appropriation occurs when a defendant uses a plaintiff's likeness

or identity for their benefit without consent. Specifically, the Defendant must have

appropriated to their own use or benefit the reputation, prestige, social or commercial

standing, public interest, or other values of the Plaintiff's name or likeness. *Doe v. Bernabei*

*& Wachtel, PLLC*, 116 A.3d 1262.

228. D.C. has adopted the four forms of invasion of privacy set forth in Restatement (Second) of

Torts § 652A. One who appropriates to his own use or benefit the name or likeness of

another is subject to liability to the other for invasion of his privacy. Restatement (Second) of

Torts § 652C.

229. The defense of public interest or newsworthiness does not apply if the use is primarily for commercial exploitation rather than public discourse. *Vassiliades v. Garfinckel's, Brooks Bros., 492 A.2d 580.*

230. Defendant, Andrew R. Jassy, is the President and CEO of Amazon. At the time of the release of *The Burial*, Mr. Jassy was the CEO of Amazon.

231. Mr. Jassy founded and led Amazon Web Services (AWS) from its inception.

232. Amazon Web Services (AWS) and Amazon Prime Video are both subsidiaries of Amazon.com, Inc., and while they operate as distinct business units, they are technologically and operationally interconnected in several key ways.

233. *Cloud Hosting and Storage* – Prime Video relies on AWS to store and deliver its vast catalog of movies, TV shows, and original content. Content is hosted in Amazon S3 (Simple Storage Service) and streamed using AWS's global infrastructure.

234. *Scalability* – AWS allows Prime Video to handle massive amounts of concurrent viewers—such as during major live events—by automatically scaling computing resources up or down as needed.

235. *Compute Power* **–** Prime Video uses Amazon EC2 (Elastic Compute Cloud) for processing video files, transcoding, running recommendation engines, and powering analytics in real time.

236. Because AWS is a pay-as-you-go model, Prime Video benefits from cost flexibility and

avoids the need to build out and manage physical data centers for global content distribution.

237. AWS provides the backbone for all of Prime Video's technical operations—from hosting and streaming to machine learning and security.

238. Defendant Amazon Prime Video is a market leader and makes revenue from multiple monetization models.

239. Defendant Amazon introduced Prime Video, which provides access to 5,000 movies and TV shows as part of its Amazon Prime membership. It offers content that comes bundled with the basic subscription price, special screenings that come at a rental cost. The video-on-demand service also runs a variety of ads to generate an additional source of revenue. Unlike Netflix, which relies mainly on subscriptions, Amazon Prime Video bundles its service with Amazon Prime, making it harder to calculate revenue per viewership.

240. According to muvi.com, Prime Video subscriptions have earned 32.87 million dollars in revenue (Q3 2024) and are expected to surpass last year's 2023 annual revenue of $40.2 billion. In the early days, when Amazon Prime Video was focused on purely customer retention, it registered a revenue of $2.76 billion in 2014. From there to today, in the past 10 years, Amazon Prime Video has been able to make 20X more revenue, reaching 40 billion dollars.

241. Courts have generally recognized that streaming platforms operating under a subscription and advertisement-based model fall within the scope of commercial enterprises, particularly when monetizing user engagement through paid memberships, pay-per-view rentals, and advertising revenue. Courts have found that when a company monetizes creative works in

this way, it is operating with a commercial purpose rather than purely for expressive or informational purposes. Amazon Prime Video's streaming business has a commercial purpose as evidenced by the nature of various previous claims.

242. For example, in *Napoleon v. Amazon.com Inc*., a collection of four class actions against Amazon challenged Prime Video's advertisement-based revenue model, reinforcing the commercial nature of its streaming business. Plaintiffs in all four actions generally allege that Defendant breached its duties to its Amazon Prime subscribers when, on January 29, 2024, it imposed an additional monthly fee of $2.99 for commercial-free video streaming, a service that Plaintiffs claim customers had already paid for through their annual subscription fee. *Id.*[7]

243. In *District of Columbia v. Amazon.com, Inc*., 320 A.3d 1073, 2024 WL 3893698 (August 22, 2024), District of Columbia brought action against online retail marketplace operator alleging restraint of trade and monopoly violations of the Antitrust Act. The District of Columbia Court of Appeals held that: 1) District adequately alleged that operator exerted substantial market power in online retail market; 2) District plausibly alleged operator's agreements with sellers imposed an unreasonable restraint on trade; and 3) District's allegations were sufficient to state a claim for an illegal monopoly. *Id*.

244. In *District of Columbia v. Amazon.com, Inc*., 320 A.3d 1073, 2024 WL 3893698 (August 22, 2024), District of Columbia brought action against online retail marketplace operator alleging restraint of trade and monopoly violations of the Antitrust Act. The District of Columbia Court of Appeals held that: 1) District adequately alleged that operator exerted substantial market power in online retail market; 2) District plausibly alleged operator's

---

[7] Case Nos. 2:24-cv-186-BJR, 2:24-cv-309-BJR, 2:24-cv-364-BJR, and 2:24-cv-728-BJR.

agreements with sellers imposed an unreasonable restraint on trade; and 3) District's allegations were sufficient to state a claim for an illegal monopoly. *Id*.

245. In *Fed. Trade Comm'n v. Amazon.com*, 2:23-cv-00932-JHC (W.D. Wash. 2023), The Federal Trade Commission (FTC) sued Amazon in the U.S. District Court for the Western District of Washington, alleging that Amazon used "dark patterns" to mislead consumers into enrolling in Amazon Prime and made cancellation deliberately difficult. The case claims violations of the Restore Online Shoppers' Confidence Act (ROSCA) and the FTC Act. *Id*.

246. In *FTC v. Amazon.com, Inc*., Case No. 2:23-cv-01495-JCC (W.D. Wash. 2023), the FTC and 17 state attorneys general filed an antitrust lawsuit against Amazon, alleging the company engaged in anti-competitive conduct to maintain its monopoly power in the online marketplace. This lawsuit is one of the most significant legal challenges Amazon has faced in recent years. *Id*.

247. In *In re Amazon Prime Video Litigation*, No. 2:2022cv00401 (W.D. Wash. 2024), consolidated multiple consumer lawsuits regarding Amazon's digital content ownership policies. Plaintiffs alleged that Amazon misled consumers into believing that purchased movies and TV shows were permanently owned when, in fact, Amazon retains the right to remove access under its terms of service. Amazon agreed to pay $25 million to settle allegations that it violated the Children's Online Privacy Protection Act (COPPA) by improperly retaining children's voice recordings and failing to honor deletion requests for Alexa users. *Id*.

248. In *Amazon.com, Inc. v. Prime Video Subscribers*, No. 2:24-cv-00186 (W.D. Wash. 2024),

Amazon was sued for introducing ads into Prime Video and requiring consumers to pay an

additional $2.99 per month to remove them. The plaintiffs argued that this constituted

deceptive conduct, as Prime Video was previously marketed as an ad-free service.

249. Amazon is noted as a leading SVoD platform for Q2 2023, with a worldwide footprint and

200 million monthly subscribers.[8]

250. Moreover, Amazon Prime Video's 2023 content budget was estimated at US$10 billion.[9]

251. The Defendant, Mr. Jassy, serves as the highest-ranking executive within Amazon.com,

Inc., and holds ultimate strategic, operational, and financial oversight of all Amazon

business divisions, including Amazon Prime Video and Amazon MGM Studios (the film and

television production arm).

252.    The Defendant's role and responsibilities as they relate to the release of movies on

Amazon Prime Video include, but are not limited to, setting the overall strategic direction for

Amazon's digital content and streaming services.

253. The Defendant would have greenlighted large-scale investments in original content, set

competitive priorities and expanded Amazon Prime Video's global reach. For example, the

decision to acquire MGM Studios and bring its library to Prime Video is a CEO-level

decision. Further, Mr. Jassy would have approved budget allocations for major productions

or licensing deals, such as *The Burial*.

---

[8] Prof. Jean K. Chalaby, Department of Sociology; City, University of London, Television and the digital economy:
An assessment of the impact of streaming platforms on the TV industry, pp. 6 (Table 2) and 20 (Table 4).
[9] Ibid., p. 22.

254. Additionally, the CEO appoints or approves leadership within Prime Video (e.g., the Former Head of Amazon Studios, Jennifer Salke).

255. Defendants knowingly and unlawfully used Plaintiff's name, image, likeness, and identity—without Plaintiff's written or oral consent—in connection with the commercial, promotional, advertising, sales, and membership subscriptions related to *The Burial*.

256. In October of 2023, the Defendants went forward with the release of *The Burial*, using the unique name, image, likeness, or identity of the Plaintiff without his permission.

257. Defendants intentionally or, at a minimum, recklessly published, printed, displayed, or otherwise publicly disseminated or used Plaintiff's name, image, likeness, or identity without his express written or oral consent, for purposes of trade or other commercial or advertising purposes as detailed above.

258. Defendants had actual or constructive knowledge of the wrongfulness of its conduct and acted with intent or with reckless disregard to deprive Plaintiff of a property interest during the entire period in which the unauthorized use took place.

259. Defendants used Mr. Dockins' name, image, likeness, or identity in advertising to increase website activity, streaming, sales, and membership subscriptions to their platforms.

260. *The Burial* has been advertised and commercially promoted by Amazon Prime Video since 2023 portrays Mr. Dockins in a way that suggests endorsement or commercial gain.

261. Upon information and belief, Willie E. Gary and Jeremiah O'Keefe received an initial payment when they signed the Agreement but never received any money afterward nor have they been provided an accounting based on revenues from *The Burial*.

262. The Defendants changed the names and likenesses of Lorenzo Williams and Bob Parenti as actual defense team members in *The Burial*.

263. At a minimum, Defendant's conduct was so reckless or wanton in care that it constituted a conscious disregard of or indifference to Plaintiff's rights.

264. Alternatively, Defendants acted negligently towards Plaintiff, in using and disseminating, without authority, his name, image, likeness, or identity on Defendant's websites to promote, advertise, and market *The Burial*.

265. Defendants have caused and will continue to cause irreparable harm to Plaintiff and his reputation and brand by attributing Plaintiff to *The Burial*.

266. Defendant has also damaged Plaintiff, as a direct and proximate result of its unauthorized use of Plaintiff's name, image, likeness, or identity without compensating Plaintiff.

267. A plaintiff need not be a celebrity or public figure to assert this claim, so long as their identity possesses commercial, reputational, or public value that is wrongfully appropriated for another's benefit. *Tripp v. United States*, 257 F. Supp. 2d 37, 42 (D.D.C. 2003); *Restatement (Second) of Torts § 652C*.

268. Defendants Amazon MGM Studios and Amazon Prime Video knowingly and unlawfully appropriated Plaintiff's name, image, likeness, and identity for use in the film *The Burial*, which was marketed, distributed, and monetized across their platforms.

269. This unauthorized use was not incidental; it formed a substantial portion of the film—

approximately 40 minutes of screen time—and was integrated into advertising campaigns, subscriber offerings, and digital promotions to drive streaming revenue and viewer engagement.

270. Given that Defendants operate a commercial streaming service generating billions in revenue through a hybrid model of subscriptions, advertising, licensing, and digital distribution, their exploitation of Plaintiff's likeness was done with a clear and direct commercial purpose.

271. The defense of newsworthiness or public interest cannot shield such conduct, particularly where the use of Plaintiff's identity served primarily to promote and monetize an entertainment product.

272. Accordingly, Plaintiff respectfully requests that the Court grant all available relief for Defendants' misappropriation of his name, image, likeness, and identity in violation of District of Columbia common law.


**COUNT VIII**
**Right of Publicity**

273. Plaintiff incorporates by reference all preceding paragraphs 1-272 as if fully set forth herein.

274. District of Columbia recognizes the common law right of publicity. *Vassiliades v. Garfinckel's, Brooks Bros., 492 A.2d 580, 586 (D.C. 1985)* (recognizing unauthorized commercial use of identity as actionable under right of publicity).

275. The right of publicity protects individuals from unauthorized commercial use of their identity. In *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959 (10th Cir. 1996), the court noted that the use of a player's image in a manner that suggests

endorsement or commercial sponsorship crosses the line from protected artistic

expression to unprotected commercial misuse.

276.  The Lanham Act, which is applicable in D.C., recognizes right of publicity principles (see

_Brown v. Twentieth Century Fox Film Corp._, 799 F. Supp. 166, 173 (D.D.C. 1992)).

Moreover, the Supreme Court recognized in _Bolger v. Youngs Drug Products Corp_., 463

U.S. 60 (1983), that commercial promotion and advertising serve a different function than

artistic expression, which may invoke scrutiny under the right of publicity if done without

consent.

277. D.C. has adopted the four forms of invasion of privacy set forth in Restatement (Second) of

Torts § 652A. One who appropriates to his own use or benefit the name or likeness of

another is subject to liability to the other for invasion of his privacy. Restatement (Second)

of Torts § 652C.

278. The misappropriation tort is "indistinguishable as a legal matter" from the "right of

publicity." _Lane v. Random House, Inc._, 985 F. Supp. 141 (D. D.C. 1995). The right of

publicity is a common law tort that protects an individual's "exclusive right to publicize and

benefit from the value of [her] identity, reputation, and work." _Id_. See also, _Tripp v. U.S.,_

_257 F. Supp. 2d 37, 42 (D.D.C. 2003)_ (recognizing common law misappropriation claim for

unauthorized use of likeness).

279. Appropriation occurs when a defendant uses a plaintiff's likeness or identity for their

benefit without consent. Specifically, the Defendant must have appropriated to their own use

or benefit the reputation, prestige, social or commercial standing, public interest, or other

values of the Plaintiff's name or likeness. _Doe v. Bernabei & Wachtel, PLLC_, 116 A.3d

1262.

*280. The Burial* has been advertised and commercially promoted by Amazon Prime Video since 2023 and portrays Mr. Dockins in a way that suggests endorsement or commercial gain.

280. The Defendants changed the names and likenesses of Lorenzo Williams and Bob Parenti as actual defense team members and used the Plaintiff's name, image, likeness, or identity in *The Burial*.

281. The Plaintiff had represented Jeremiah O'Keefe on at least two other matters prior to *Jeremiah J. O'Keefe, Sr., et al. v. Loewen Group, Inc. et al.,* No. 91–677–423.

282. Defendants violated Plaintiff's common law right of publicity by using his identity for commercial gain without his consent.

283. Defendants, for commercial, promotional, and advertising purposes, knowingly and unlawfully used Plaintiff's name, image, likeness, and identity—without Plaintiff's written or oral consent—in connection with the film *The Burial*.

284. Specifically, actor Mamoudou Athie portrays the Plaintiff as a young and capable attorney who is central to Jeremiah's legal team and plays a critical role in connecting Jeremiah with attorney Willie Gary.

285. Mr. Athie's depiction of the Plaintiff amounts to approximately 40 minutes of screen time (a significant portion of the film).

286. This portrayal was used by Defendants in the marketing, distribution, and sale of *The Burial* and related products available through Amazon Prime Video and affiliated platforms.

287. Defendant Amazon introduced Prime Video, providing access to over 5,000 movies and TV shows, including *The Burial*, as part of its Amazon Prime membership. It offers content that comes bundled with the basic subscription price, and special screenings that come at a rental cost. The video-on-demand service also runs a variety of ads to generate an additional source

of revenue. Unlike Netflix, which relies mainly on subscriptions, Amazon Prime Video bundles its service with Amazon Prime, making it harder to calculate revenue per viewership.

288. According to muvi.com, Amazon Prime Video subscriptions have earned 32.87 million dollars in revenue (Q3 2024) and are expected to surpass last year's 2023 annual revenue of $40.2 billion. In the early days, when Amazon Prime Video was focused on purely customer retention, it registered a revenue of $2.76 billion in 2014. From there to today, in the past 10 years, Amazon Prime Video has been able to make 20X more revenue, reaching 40 billion dollars.

289. Defendants used Mr. Dockins' name, image, likeness, or identity in advertising to increase website activity, streaming, sales, and membership subscriptions to their platforms.

290. Upon information and belief, Willie E. Gary and Jeremiah O'Keefe received an initial payment when they signed the Agreement but never received any money afterward, nor have they been provided an accounting based on revenues from *The Burial*.

291. Defendants have captured and utilized Plaintiff's identity for commercial purposes, thereby depriving him of the economic benefits that would flow from such usage had he been compensated or permitted such use.

292. Therefore, the Defendants violated Plaintiff's right to control the commercial use of his name, image, likeness, identity and persona.


## **RELIEF**

WHEREFORE, Plaintiff requests entry of judgment against Defendant, as follows:

    a.  Compensatory damages for emotional distress, reputational harm, and economic losses;

b.  Statutory damages under D.C. law;

c.  Punitive damages for intentional misconduct;

d.  Treble damages;

e.  Injunctive relief prohibiting further use of Plaintiff's name, image, or likeness;

f.  Attorney's fees and costs; and

g.  Any other relief deemed just by this Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 29, 2025

Respectfully submitted,

By: _/s/ Tricia P Hoffler
Tricia P. Hoffler
DC Bar No. 419816
The CK Hoffler Firm
27 Lenox Point NE
Atlanta, GA 30324
Tel: 404-263-0201
Fax: 404-263-0202
www.ckhofflerfirm.com
ck@ckhofflerfirm.com
*Attorney for Plaintiff*

51

# EXHIBIT A

Bobby Shriver
c/o Bloom, Hergott, Cook, Diemer and Klein, LLP
150 S. Rodeo Drive, 3rd Floor
Beverly Hills, CA 90212
Attn: Candice Hanson, Esq.

As of May 2, 1996

Willie Gary, Esq.
221 E. Ofceola St., Suite 300
Stuart, FL 34994

Jerry O'Keefe
611 Jackson Ave.
Ocean Springs, MS 39566-0430

### Re: Life Story Rights Acquisition

Gentlemen:

    This will confirm the agreement ("Agreement") reached between Bobby Shriver ("Purchaser"), on the one hand, and Willie Gary ("Gary") and Jerry O'Keefe ("O'Keefe") (Gary and O'Keefe are sometimes collectively referred to herein as "Owner"), on the other hand, with respect to the exclusive motion picture, television and allied rights in Owner's life story, including without limitation, all events, occurrences, experiences, stories, developments, episodes, incidents, circumstances, transactions and affairs related thereto or occurring therein ("Property"). The term "Picture" as used herein shall mean the first production produced hereunder and based upon the Property, whether intended for initial theatrical exhibition, television exhibition or otherwise. The Agreement is as follows:

    1.    OPTION. In consideration of payment by Purchaser to Owner of the sum of One Dollar ($1), receipt of which Owner hereby acknowledges and Purchaser's continuing efforts to set-up the Property for development and production as a motion picture ("Option Payment"), Owner hereby grants Purchaser the sole, exclusive and irrevocable option ("Option") to purchase all "Rights" (defined in paragraph 3 below) in and to the Property. The Option shall be exercisable at any time commencing on the date hereof and continuing through and including the date which is twelve (12) months after Owner's execution hereof. Purchaser may extend the Option for a period of six (6) additional months ("Extension Period") commencing upon the expiration of the Option by giving Owner written notice of such extension together with a payment of One Dollar ($1) ("Extension Payment") on or before the date on which the Option would otherwise expire.

    2.    PURCHASE PRICE. If Purchaser elects to exercise its Option, as full and complete consideration for the Rights and all other rights and privileges granted and agreed to be granted, Purchaser agrees to pay Owner as follows:

    (a)  Purchase Price: The purchase price for the Property shall be an amount equal to two percent (2 %) of the final overall approved budget of the Picture on the first day of principal

-1-

photography thereof (exclusive of overhead, contingency, bond fee, deferments, interest and financing costs) ("Budget") ("Purchase Price"). Notwithstanding the foregoing, in no event shall the Purchase Price be less than Fifty Thousand Dollars ($50,000) nor more than Five Hundred Thousand Dollars ($500,000). In the event Purchaser exercises the Option prior to setting the Budget, the Purchase Price shall be Fifty Thousand Dollars ($50,000); it being understood that once the Budget has been set, to the extent that Purchase Price exceeds Fifty Thousand Dollars ($50,000) based on the formula set forth above, Purchaser shall pay Owner the difference, if any, between Fifty Thousand Dollars ($50,000) and such Purchase Price within the parameters set forth above, if any. The Purchase Price shall be payable anytime on or before the expiration of the Option Period.

(b)   Net Profits: If the Picture is a feature-length theatrical motion picture, then Owner shall be entitled to receive an amount equal to two and one-half percent (2.5%) of one hundred percent (100%) of the "net profits", if any, derived from the exploitation of the Picture. For purposes hereof, "net profits" shall be computed, defined, accounted for and paid as net profits are computed, defined, accounted for and paid pursuant to the provisions of the standard "net profits" definition of the third party financier with respect to the Picture. In the event that Purchaser does not enter into an agreement with a Third Party, Owner's share of "net profits" shall be computed, defined and paid in accordance with Purchaser's standard definition of net profits.

3.     CONSULTATION. Owner shall have the right of consultation with Purchaser with respect to the fictionalization of Owner in the Picture, but in the event of a disagreement, Purchaser's decision shall be final and binding.

4.     GRANT OF RIGHTS.   Upon exercise, if any, of the Option, Purchaser shall automatically and exclusively own and be vested with all rights of every kind and nature, in and to the Property, including without limitation, all motion picture, television and allied rights throughout the universe in perpetuity.   The Rights include, without limitation, the following sole and exclusive theatrical, television (whether filmed, taped or otherwise recorded, and including series rights and CATV rights), audio, audio cassette, videocassette and other compact devices, sequel, prequel, remake, spin-off, radio, live television, novelization and advertising and promotion rights (including the rights to broadcast and or telecast by television and/or radio or any process analogous thereto, or by any process now known or hereafter devised, any part of the Property or any adaptation or version thereof, and announcements of and concerning such version); digital television, video and computer games, videocassette and video or laser disc, any computer assisted media (including, but not limited to, CD-ROM, CD-I and similar disc systems), interactive media and multi-media and any other devices or methods now known or hereafter devised, all rights to exploit, distribute and exhibit any motion picture or other production based upon the Property in all media now known or hereafter devised throughout the universe, in perpetuity.   The rights granted herein are in addition to and shall not be construed to be in derogation of any rights which Purchaser may have as a member of the public.   In addition, Purchaser shall have the right to use Owner's name, or any variant thereof, likeness, or any simulation thereof, voice and biography; to portray, impersonate or simulate events or experiences contained in or related to Owner's life; the right to employ any actor(s) to portray you, which actor(s) may or may not resemble Owner; in and in connection with the production, exhibition, distribution, advertising and exploitation of the Picture or any production produced hereunder and the rights therein throughout the universe in perpetuity. In the exercise of such rights, Purchaser shall have the unlimited right to fictionalize, dramatize, change or embellish, in whole or in part, any information or matter concerning

-2-

Owner or the events in Owner's life, in such manner as Purchaser may deem proper and to use all or any part of any picture or still photographs in which Owner appears or appeared and any or all recordings of Owner's voice. Owner hereby irrevocably waives any objections Owner might have that Purchaser's portrayal of Owner's life story and/or the use of Owner's name constitutes an invasion of Owner's privacy or right of publicity or otherwise violates any rights Owner might have in connection with such portrayal.

5.   REPRESENTATIONS AND WARRANTIES.   Owner hereby represents and warrants (and acknowledges that Purchaser has relied thereon) as follows: (a)  Owner is the sole and exclusive owner of all rights, licenses, privileges and properties throughout the universe herein conveyed to Purchaser;  (b) the full use of the Property or any part thereof, as herein granted, does not in any way violate or infringe upon any copyright (common law or statutory) belonging to any person, firm or corporation, or constitute a libel or defamation or an invasion of the rights of privacy of or publicity of, or otherwise violate or infringe upon any right of confidentiality or any other rights of any person, firm or corporation;  (c)  Owner has the full right, power and authority to enter into this Agreement and to grant to Purchaser all of the rights herein provided;  (d)  no motion picture, television, radio, dramatic or other version or adaptation based on the Property has heretofore been made, produced, performed, copyrighted or registered for copyright, in any country of the world;  (e) Owner has not assigned or licensed to any other person, firm, or corporation, or in any manner encumbered or hypothecated, any of the rights herein granted to Purchaser with respect to the Property; and (f)  Owner will not at any time hereafter make any other agreement in conflict herewith or in any way attempt to sell, dispose of, encumber or hypothecate any of the rights in the Property herein granted to Purchaser, or do or knowingly permit to be done any act or thing by which said rights may be impaired.

6.   INDEMNIFICATION.   Owner agrees to indemnify, defend and hold harmless Purchaser, its subsidiaries, affiliated companies and its licensees, successors and assigns and the officers, directors, employees and agents of each of them from and against any and all claims, damages, losses, liabilities, obligations, judgments, and/or costs and expenses (including, but not limited to, reasonable attorneys' fees) sustained, suffered, paid or incurred by any or all of them as a result of or in connection with any breach or alleged breach of any warranty or representation made or entered into hereunder by Owner.

7.   REMEDIES.   Owner hereby expressly recognizes that a breach of Purchaser's obligations hereunder, the damage, if any, caused to Owner thereby is not irreparable or otherwise sufficient to entitle Owner to injunctive or other equitable relief.  Consequently, Owner's rights and remedies in the event of a breach by Purchaser shall be limited to Owner's rights, if any, to seek damages in an action at law, and in no event shall Owner be entitled by reason of any such breach to rescind this Agreement or any rights granted to Purchaser hereunder or to enjoin or restrain the production, distribution, exhibition and/or exploitation of any motion picture, television or dramatic version of the Property produced hereunder, or to enjoin or restrain Purchaser's exercise of any rights granted to Purchaser hereunder.

8.   RELEASE. Owner hereby agrees to release and discharge Purchaser, its subsidiaries, affiliated companies and its licensees, successors and assigns and the agents, officers, directors and employees of each of them from any and all claims, demands or causes of action that Owner may now have or may hereafter have for libel, defamation, invasion of privacy or right of publicity, infringement

-3-

of copyright or violation of any other right, arising out of or relating to any use of the rights granted to Purchaser hereunder or based upon any failure or omission to make use thereof. This Agreement shall be construed in accordance with the laws of the State of California applicable to agreements which are fully signed and performed within said State and Owner hereby waives any rights Owner may have, known or unknown, pursuant to Section 1542 of the California Civil Code which provides:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

9.    FURTHER INSTRUMENTS. Owner agrees to execute, acknowledge and deliver at Purchaser's request any and all additional documents or instruments necessary or desirable to effectuate the purposes of this Agreement, and to do any and all things necessary or desirable to effectuate the purposes of this Agreement. If Owner shall fail to execute, acknowledge or deliver to Purchaser any agreements, assignments or other instruments to be executed, acknowledged and delivered by Owner hereunder, then Purchaser is hereby irrevocably appointed Owner's attorney-in-fact with full right, power and authority to execute, acknowledge and deliver the same in the name of and on behalf of Owner, Owner acknowledging that the authority and agency given Purchaser is a power coupled with an interest.

10.    RIGHT OF ASSIGNMENT. Purchaser may assign or transfer this Agreement or any part of its rights hereunder to any party. This Agreement shall inure to the benefit of Purchaser's heirs, representatives, successors and assigns forever and shall be binding upon Owner's heirs, represen- tatives, successors and assigns. Owner may not assign this Agreement or any of its rights hereunder to any others.

11.    MISCELLANEOUS. This Agreement supersedes and replaces all agreements (oral or written) between Purchaser and Owner relating to the Property. This Agreement shall be governed and construed in accordance with the laws of the State of California applicable to contracts entered into and fully performed therein. Until a more formal agreement is executed incorporating all of the foregoing and additional detailed grant of rights, no injunctive relief, extension for force majeure and/or third

//

//

//

//

//

//

//

-4-

party claims, additional representations, warranties, notices, development and pre-production activities and other provisions customarily included in such life story rights agreements, all of which are incorporated herein by reference, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, representatives, assigns and licensees and may not be modified or amended except by a writing signed by both parties.

Please confirm your agreement with the foregoing by signing in the space provided below.

Very truly yours,

Bobby Shriver

AGREED TO AND ACCEPTED:

Willie Gary, Esq.

(Soc. Sec. # 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 )

Jerry O'Keefe

(Soc. Sec. # 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)

5-22-96

Date of Execution

-5-

## OPTION AGREEMENT

KNOW ALL PERSONS BY THESE PRESENTS: that for good and valuable consideration, receipt of which is hereby acknowledged, the undersigned, Willie Gary and Jerry O'Keefe (collectively, "Owner"), hereby grants to Bobby Shriver ("Purchaser"), and Purchaser's representatives, successors, licensees and assigns, the exclusive and irrevocable right and option to purchase and acquire from Owner the sole and exclusive right, title and interest, including, without limitation, all motion picture, television, and customary allied and incidental rights for production, advertising and exploitation purposes, in all languages, throughout the universe in perpetuity, in and to Owner's life story, including without limitation, all events, occurrences, experiences, stories, developments, episodes incidents, circumstances, transactions and affairs related thereto and occurring therein.

Owner represents and warrants that Owner is the owner of the rights, and that Owner has not heretofore sold, assigned, transferred, mortgaged, pledged or hypothecated any of the rights.

Purchaser's Option shall commence as of _____ May 23, 1996 _____ and continue for a period of twelve (12) months. Purchaser shall have the right to extend the Option Period by six (6) additional months. The Option herein granted may be exercised by Purchaser, or its heirs, representatives, successors, licensees or assigns as provided in that certain option/purchase agreement dated as of May 2, 1996 ("Agreement") between Purchaser and Owner, and this Agreement is subject to all of the terms and conditions of the said Agreement, all of which are incorporated herein by reference.

IN WITNESS WHEREOF, the undersigned has executed this instrument this 23rd day of _____ May _____, 199 6.

Willie Gary

Jerry O'Keefe

CSH/48945_2.DOC
05/21/96 4:11 PM

STATE OF FLORIDA )
                              ) SS.
COUNTY OF MARTIN )

On 5/23/96 before me, JAMES D. KELLEY, personally appeared Willie Gary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

JAMES D KELLEY
My Commission CC310246
Expires Aug. 23, 1997
Bonded by HAI
800-422-1555

_James D. Kelley_
Notary's Signature

STATE OF Mississippi )
                                    ) SS.
COUNTY OF HARRISON )

On 5-22-96 before me, Patricia L. Bartholomew personally appeared Jerry O'Keefe, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Patricia L. Bartholomew_
Notary's Signature

(SEAL)

MISSISSIPPI STATEWIDE NOTARY PUBLIC
MY COMMISSION EXPIRES APRIL 17, 2000
BONDED THRU STEGALL NOTARY SERVICE

-7-

## ASSIGNMENT

KNOW ALL PERSONS BY THESE PRESENTS:   that   for   good   and   valuable consideration, receipt of which is hereby acknowledged, the undersigned, Willie Gary and Jerry O'Keefe (collectively, "Owner"), hereby grants, sells, assigns and sets over to Bobby Shriver ("Purchaser"),   and   Purchaser's   representatives,   successors,   and   assigns,   as   of _____, 199__ the sole and exclusive right, title and interest, including, without limitation, all motion picture, television and certain allied and incidental rights for production, advertising and exploitation purposes, in all languages throughout the universe, in perpetuity, in and to Owner's life story, including without limitation, all events, occurrences, experiences, stories, developments, episodes, incidents, circumstances, transactions and affairs related thereto and occurring therein.

Owner and Purchaser have entered into or are entering into a formal option/purchase agreement dated as of May 2, 1996 ("Agreement") relating to the transfer and assignment of the rights in and to said literary work, which rights are more fully described in the Agreement, and this assignment is expressly made subject to all of the terms, conditions and provisions contained in the Agreement, all of which are incorporated herein by reference.

IN WITNESS WHEREOF, the undersigned has executed this assignment this 23rd day of _____May_____, 199 6.

Willie Gary

Jerry O'Keefe

-8-

STATE OF _FLORIDA_____ )
                         ) SS.
COUNTY OF _MARTIN_____ )

On _5/23/96___ before me, _JAMES D. KELLEY_, personally appeared Willie Gary, personally
known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

JAMES D KELLEY
My Commission CC310246
Expires Aug. 23, 1997
Bonded by HAI
800-422-1565

(SEAL)

_____
Notary's Signature

STATE OF _MISSISSIPPI_____ )
                            ) SS.
COUNTY OF _HARRISON_____ )

On _5 22 96___ before me, _Patricia L. Bartholomew_, personally appeared Jerry O'Keefe, personally
known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary's Signature

MISSISSIPPI STATEWIDE NOTARY PUBLIC
MY COMMISSION EXPIRES APRIL 17, 2000
BONDED THRU STEGALL NOTARY SERVICE

(SEAL)

-9-

CSH/48945_2.DOC
05/21/96 4:11 PM

Willie Gary, Esq.
221 E. Ofceola Street, Suite 300
Stuart, FL 34994

Jerry O'Keefe
611 Jackson Avenue
Ocean Springs, MS 39566-0430

As of May 2, 1996

Bobby Shriver
c/o Bloom, Hergott, Cook, Diemer and Klein, LLP
150 South Rodeo Drive, Third Floor
Beverly Hills, CA 90212
Attention: Candice S. Hanson, Esq.

### Re: Life Story Rights Acquisition

Dear Bobby:

Reference is hereby made to the agreement dated as of May 2, 1996, ("Agreement") between Bobby Shriver ("Shriver"), on the one hand, and Willie Gary ("Gary") and Jerry O'Keefe ("O'Keefe") (Gary and O'Keefe are sometimes collectively referred to herein as "Owner"), on the other hand, with respect to, amongst other rights, the exclusive motion picture, television and allied rights in Owner's life story,

In consideration of your entering into the Agreement, Shriver, Gary and O'Keefe have agreed as follows:

1.      Owner agrees that the compensation set forth in subparagraphs 2(a) of the Agreement shall be shared among Owner and Shriver so that seventy-five percent (75%) of such compensation is paid to Gary and O'Keefe and twenty-five percent (25%) is paid to Shriver.

2.      The parties acknowledge that Shriver will enter into a separate agreement for Shriver's producing or executive producing services in connection with the Picture (as defined in the Agreement). Owner shall be entitled to receive an amount equal to twenty-five percent (25%) of the cash compensation received by Shriver for such services. For the purposes hereof, the cash compensation shall exclude any contingent compensation, including without limitation, (any) participation(s) in profits. Shriver agrees that the minimum cash compensation for such services shall be One Hundred Fifty Thousand Dollars ($150,000).

-10-

3.     The parties agree that they shall execute such further and other documents as may be required to effectuate the intent of this agreement, including, without limitation, letters of direction, if reasonably requested by Shriver, failing which each of Shriver and Owner agrees that they shall account to the other in respect of monies due hereunder within seven (7) working days of receipt of such monies.

If the foregoing is in accordance with our understanding, please execute the attached copy of this letter and return same to the undersigned.

Very truly yours,

Willie Gary, Esq.

Jerry O'Keefe

AGREED TO AND ACCEPTED:

Bobby/Shriver

-11-